IN THE MATTER OF THE ESTATE OF WARREN T. GOLDING, DECEASED.

MABEL GOLDING, FORMERLY MABEL WRIGHT, APPELLANT, v. A. E. PAINTER, AS PETITIONER FOR THE PROBATE OF THE LAST WILL AND TESTAMENT OF WARREN T. GOLDING, DECEASED, RESPONDENT.

No. 3262

May 3, 1939. 89 P.(2d) 1049.

*J. M. Frame* and *F. Raffetto,* for Petitioner:

*Painter, Withers & Edwards,* for Respondent:

*Melvin E. Jepson*, for Respondent, did not file a brief, but participated in the oral argument.

## OPINION

By the Court, DUCKER, J.:

This case is before the court for the second time on appeal from a judgment overruling objections to the admission of a will to probate and from an order denying a motion for a new trial. On the first appeal the judgment was reversed on the ground of error by the trial court in striking certain testimony of appellant. In re Golding's Estate, 58 Nev. 274, 76 P. (2d) 1099.

For many years Warren T. Golding conducted a trading post on the Pyramid Lake Indian Reservation, at Nixon, Nevada, where he lived with his wife, Clara O. Golding. She obtained a divorce from him in the Second

judicial district court of this state on July 16, 1927. The decree of divorce was filed at the hour of ten o'clock (10 : 00) a. m. on that day.

In its findings of fact in the divorce action a written agreement entered into by the parties on the 15th day of July 1927, pursuant to which Warren T. Golding made and executed the will appellant is now contesting, was approved by the court. She is not provided for in the will or mentioned therein. After a certain bequest is made therein to Clara O. Golding, in compliance with said agreement, the residue of his estate is devised and bequeathed to his brothers and sisters.

Appellant claims that after the divorce was granted she became the common-law wife of Golding and was such at the time of his death. The trial court decided that she did not become the common-law wife of Golding and accordingly made and entered the judgment appealed from.

■ The single question presented is whether the evidence is sufficient to sustain the judgment of the trial court.

A general review of the evidence is necessary. In addition to the facts stated above it appears that appellant, an Indian woman, was born at Nixon, Nevada. Her name was Mabel Wright. She was about thirty years of age at the time she claims she was married to Golding, and he was then about seventy years of age. When she was a girl, during the years 1912–13–14 she worked for the Goldings at their home in Nixon, doing the cooking and general housework. At first she was paid twenty-five cents a day and later fifty cents a day, and was given her meals. She also attended the school at Nixon during that time and slept at the schoolhouse.

Concerning the alleged marriage relation, appellant, who will also be spoken of as Mabel, or Mabel Wright, testified that on July 16, 1927, Golding asked her to marry him and she agreed to do so. Her counsel asked:

"What did he say to you at that time? A. He asked me to marry him.

"Q. How were you to marry him—the Indian Custom? A. Indian custom.

"Q. A common law marriage? A. Yes.

"Q. And ever since that time you have lived and cohabited together as husband and wife during his life time, up to the time of his death? A. Yes."

Further in that regard she testified as follows:

"Q. You were married at the Reservation? A. Yes.

"Q. At Nixon, Nevada? A. Yes.

"Q. On July 16, 1927? A. Yes. * * *

"Q. How do you remember you got married to him by your Indian custom in the morning? A. Well, he was coming along the road there, coming to Reno, and he asked me to marry him and I said yes, and that is how we got married.

"Q. About what time in the morning was it? A. I don't know, about ten— nine—

"Q. About nine o'clock in the morning? A. Yes.

"Q. Of July 16, 1927. A. Yes.

"Q. And ever since that time you claim you are the common law wife of Mr. Golding. A. Yes, ever since I am his wife."

Further she testified that after the marriage agreement she returned with Golding to Nixon on the same day and lived with him. "I lived back of the store where my husband owns everything. I got a house back there, and there is where he kept me."

Concerning this she gave the following testimony:

"Q. You both went back together? A. Yes.

"Q. How long did you stay there? A. I stayed there to his house and we got back there, I stayed there a little while and then came back to my home.

"Q. Where did you live? A. I live where my mother's house.

"Q. At that time? A. But I go to his house often.

"Q. You live at your Mother's house? A. Yes, and sometimes I go over and live with him.

"Q. And you went back and forth to Mr. Golding's place. A. Yes.

"Q. Did you do the housework for him at that time? A. Yes, I did the housework for him and washed dishes and everything, and cooked.

"Q. And when you finished you went back to your mother? A. Sometimes I stayed with him. I sleep with him night times.

"Q. There is a little place out in back? A. Little cabin.

"Q. Did you ever stay back there? A. Yes."

Concerning a change of residence by Golding from Nixon to Sutcliffe, and her relations with him there, she testified that after he sold his store in 1927 he went to the latter place to live.

"Q. Where did he live at Sutcliffe? A. He built a house over there. * * * I went over there and cooked for him and slept. * * *

"Q. You stayed with him all night. A. Yes.

"Q. Did you hear her (her mother) testify that you only went there in the day time and visited him? A. She goes over there in the day time but I remain there in the night time to stay with him.

"Q. You didn't go back with your mother? A. No.

"Q. Did you stay all the time? A. Stay there three or four days and he either take me back or my brother come after me.

"Q. Did you cook for him? A. Yes.

"Q. And take care of the house for him? A. Yes.

"Q. Did he pay you money? A. No.

"Q. Did he give you presents? A. No."

She said, "I go and see him, whenever I want to stay, I stay."

Golding moved from Sutcliffe, Nevada, to California. Concerning his going there and her relations with him in that state she testified: "When his people sell out this lot, well, he said, 'Mabel I have to get out. I am going to take you along to Sawtelle, California.' And he come to my mother's house and he get everything ready and he ask my mother if he take me, and we all say yes, it would be perfectly all right." She testified

to making several trips with him from Sawtelle, California, to Nixon and return, and one trip to Klamath Falls, Oregon, with him.

"Q. How long did you live in Sawtelle, California? A. I could not tell you how long because I made three trips with him back and forth.

"Q. Did he go into the Sawtelle Home there for a while? A. Yes, he stayed there for a while. We came home to go over there to live and whenever he want me he write to me and he open up the house and we live there together.

"Q. He stayed in the Solders' Home quite a while at different times, didn't he? A. Yes.

"Q. You were not living with him then? A. No.

"Q. You were back here? A. Yes."

As to the trip she made with him to Klamath Falls, she testified as follows:

"He was all right. He drove the car, or we both go together, went out fishing and hunting and sleeping together. * * * We stayed there six months. We go back to Oakland and he sent me back in Bus to the Reservation."

"Q. Do you remember what year that was? A. 1933.

"Q. Then that was the last time you went to California? A. Yes.

"Q. And the next time you saw him was in June 1936? A. Yes."

She next saw him at 257 Mill Street, Reno, Nevada, to which place he had come, a sick man. Concerning her meeting him there and her relations with him she testified: "When he first came he called for me and I came right away to his house and live with him. * * * We both sleep together when he first came—always sleep together until he gets very sick. I have to make my own bed in other little room there, but I stayed with him night and day."

She testified that she did the housework there, the cooking, washing and ironing; and kept him clean and comfortable. She remained with him there until he died

on August 21, 1936. She testified that Golding always treated her as a wife from July 16, 1927, up to the time of his death; that they always acted towards each other as husband and wife; that he gave her the ring she was wearing; that after July 16, 1927, she took his name; that he never paid her any wages after marriage; that he bought her clothing; that he sent her money all the time and provided for her in every way; that she cooked for him and kept house for him; and that when they visited they always went together. "When he got real sick, I asked him," she said, "in case anything happen to him, what am I going to do, and he said, 'Mabel, well, you are going to be well fixed. Everything is made to you."

She testified that she used the name of Mabel Golding after the divorce, used it right along; and that she wrote to Golding after the divorce and signed the name Mabel Wright. Later she said: "I used my name right along, Mabel Wright and Mabel Golding. I used both names." She testified that after his death she did not write to anybody using the name of Mabel Wright. She identified a number of letters that passed between her and him, which were introduced in evidence; also a letter written by her to Mrs. E. Long. She said that all letters came to her from him addressed to Mabel Wright.

The testimony set out above has been subjected to some condensation, but has been fairly stated in substance.

Appellant's mother, aunt, sister, and brother testified in her behalf. The mother, Annie Wright, on account of her meager knowledge of our language had difficulty in comprehending the questions asked and in expressing herself. She testified that her husband's name was Johnny Wright and she took his name when she married him. She testifieid as to Mabel working for the Goldings when she was a little girl; as to the kind of work she did; and as to the pay she received. As to their life in Sutcliffe and California the following testimony was given by her:

"Q. Did Mabel go to Sutcliffe with him? A. No, she was visiting with him in the daytime and when she asked me she wanted to go to California and she asked me he wanted to go with her and we talk together and the three and he said all right and she go with him.

"Q. And she went to Sawtelle? A. Yes."

Further as to their going to California she testified as follows:

"Q. Did Mr. Golding come to you and say anything about taking Mabel away? A. Yes.

"Q. Tell that to the court. A. Yes, I don't understand very well. He ask me, he was going down to— what you call it? He asked me, he wanted Mabel to go down with him, and me and Mabel talked together and she said all right, and she often go down there. I don't know what you call that place.

"Q. Did Mabel go away with him at that time? A. Yes.

"Q Where has she lived since that time? Has she been with him up to the time he died? A. When she die?

"Q. When Mr. Golding died, he died this year? A. Yes, he died right there.

"Q. Did Mabel stay with him up to that time? A. Yes, and she took care of him. * * *

"Q. That was when he was sick? A. Yes."

Asked concerning Mabel and Golding coming to her home to visit, she said: "Yes, sometimes day time she visit with us at my house and then that is all, and some times she go out to visit with our home and then she stay. Mabel she stay behind from Mr. Golding's little cabin he kept them there, Mabel, and then she left the little boy go to school at that time. Mabel was to stay with him and I, after that he sold that store and went away and she went down to that place and we went up there, and after New Years time we give a turkey present to him, and that time we went up there he asked me about Mabel go with him, and me and Mabel talked together, and we said all right, and she go with him after that, and she come here. * * *"

Concerning the Indian custom of marriage, the following was elicited:

"Q. Do you know what an Indian marriage is? A. Yes, he always, some man, go to his home and you know, man you know, go to his folks home and then he get married. Indian way all the time that way, you know.

"Q. And he takes her and takes her to his house and calls her his woman, or his wife, does he? A. Oh, sometimes he lives with people, his girl's house and some times he takes his boys folks name. That is the way the Indian do."

The sister, Josephine French, testified substantially as follows: She had seen appellant and Golding together many times at Nixon, Reno, and Los Angeles. She saw them living together in a house at Nixon. She took a trip with them to Los Angeles in 1928 and stopped with them in their home. They were living together and he treated her as his wife. He treated her very affectionately. In 1928, in Sawtelle, California, Golding and Mabel occupied the same room just like they were married. Appellant cooked for him there. They visited relatives there. They went to Sutcliffe where he had a house. In the summer of 1933 he took appellant to Klamath River on a trip. She had heard Golding say in Los Angeles that Mabel was his wife. In the spring of 1928 when they left for Los Angeles he said, "Mabel belong to me and I am going to take her to Los Angeles and take care of her." He said he wanted Mabel to be his wife in Indian and he said he asked Mabel to marry him and she didn't want to marry him in the White way.

When he went to the place on Mill Street in Reno he sent for Mabel. The witness also went to the house on Mill Street to help take care of Golding and was there when he died. Mabel's room was not far from Golding's, and witness slept with Mabel. Ever since witness was married she used the name of Josephine French. Golding bought all Mabel's clothing. He sent her a box every Christmas and always sent her money when he

could spare it. At the time he took Mabel away he told witness and her father and mother that he was going to keep her; and that is the Indian way of contracting marriage. The general repute among the Indian relations and friends and associates was that they were husband and wife and were married according to the Indian custom. He always treated her respectfully, the way other men treated their wives, somebody that they loved. That was the general repute. "I know he gave her a ring." The Indian way of marriage was just to go and live together and raise families.

Appellant's aunt, Minnie Houten, testified that she had seen Golding and Mabel together on many occasions; and that she spent two weeks of one summer with them in Sawtelle, California, but did not go out any place. Golding and Mabel occupied the same bedroom there. "He always called her Mabel. She belong to me and whenever I leave I will take care of her and leave plenty whenever I go away. He referred that to me many times, she was the only girl." She treated him the same way. Many ladies down there recognized her as his wife. The witness was acquainted with those Indian people, talked with them; they associated with Golding and Mabel and talked about them as man and wife; and that was the general repute.

Her brother, Paul Wright, testified that just before Mr. Golding went to California in the spring of 1927 and took Mabel with him, he came to the house of his mother and gave Mabel a ring and put it on her left thumb and said, "You belong to me now."

Kate Williams, an Indian woman, testifying in behalf of the appellant, stated that she had known Mabel ever since she was a little girl; that she knew Golding and knew when Mabel went to live with him, and had a conversation with him in which he said: "I am going to marry Mabel." The witness testified that she was married and after the marriage took her husband's name, Williams.

George A. Evans, testifying in behalf of appellant,

stated that he resides at Sawtelle, California, but had done considerable trading with Golding; that he had seen Golding and Mabel together frequently since 1927; that on one occasion in Golding's store during the year 1927, the latter said: "I am going to take her with me." I said, "Yes, that is good." Asked to state the Indian custom of contracting marriage he replied: "* * *· They like one another and go out and stay together, and they are married in that way, and I am married in that way. * * * An Indian custom that the White man calls common law marriage. * * *" Later he stated that his mother was a Pitt River Indian and his father a White man. He also testified that the general repute among the Indians and those that associated with them, was that Golding was Johnnie Wright's son-in-law.

Mamie John, Brady Calico, Mike Rhodes and Raymond Natchez testified in behalf of appellant. The former stated that she lived at Nixon, Nevada, and knew appellant and Golding. In 1927 and 1928 they were living in the same house in Sutcliffe. She visited their house often during that period. She did washing for Golding; washing men's clothing and Mabel's clothing. She heard Golding call Mabel his wife. She saw them in the same room and their slippers on both sides of the bed; saw them eating at the same table. At Nixon she heard the Indians laughing and saying, "That Mabel had an old man husband." At Nixon Mabel lived with Golding back of the store.

Brady Calico lived at Nixon and knew Golding and appellant at Nixon and Sutcliffe. He helped build the house they lived in at the latter place. Mabel, Golding, and Sutcliffe were living in the same house. The former acted like they were man and wife. The people at Nixon say that they were married.

Mike Rhodes, living at Nixon from 1927, knew appellant and Golding. At that time she lived in Golding's house back of his store. The general repute among the people in that community as to their relation was that

they were living together as man and wife. It was common talk.

Raymond Natchez, a witness in behalf of appellant, had lived in Nixon all his life and knew appellant and Golding. In the summer of 1927 appellant, Golding, and Sutcliffe moved into a house at Sutcliffe. Asked as to the general repute among the people of the neighborhood as to their relations, he said: "Well, anybody knows that they were married as to common law. * * * According to our regulation and rule * * * Yes, in the Indian custom we say we are man and wife and we stay together. * * * That is what the people generally said when they spoke about them."

Edward Caughlin, a witness on behalf of respondent, testified that he went to work for Golding, clerking in his store in 1920 and became acquainted with appellant, who was doing the housework for Golding; that he left the latter's employ in 1928 or 1929 and next met him in Reno in June 1937 when Golding was living at 257 Mill Street; that he saw him there frequently; that witness was living at Golding's house when he died and had been living there for a while before that; and that he spent a good deal of his time there. When Golding was taken ill he sent for appellant. She came and nursed him and also did the cooking and housework. The witness slept there, occupying a room next to Golding's room. Mabel slept there occupying a room more remote from Golding's room and remained there day and night until Golding died in September of that year. Golding treated her affectionately and she was very much distressed when he died. Golding and Mabel did not, to his knowledge, occupy the same room. If they had he thought he would have known it. Witness could not recall any conversation between Mabel and Golding at the house at Mill Street with reference to marriage. Mr. Golding always addressed her as Mabel.

Nettie Cooper, a witness on behalf of respondent, testified that she resided at Sutcliffe about a year and a half or two years in 1928 and 1929. Golding first

lived at her father's house where she also lived, and later in a little house of his own which he built. She exchanged visits with Golding frequently and saw him every day. She never saw Mabel there but twice and that was when the latter would come to bring his laundry and take it home to Nixon. If Mabel had been there at any time she would have seen her. She never heard any discussion going on in the neighborhood about the relationship of Mabel with Golding. She supposed the relationship was master and servant, but never heard it talked of. She never heard any one in the neighborhood of Sutcliffe say that they were husband and wife. She at no time heard either of them say anything to one another that would indicate that they were husband and wife. She was in Los Angeles for four weeks and visited at his house in Sawtelle three or four times. She did not see Mabel there. She heard she was down there but did not know where she was.

Charles Cooper, a witness on behalf of respondent, resided at Sutcliffe and had resided there since 1916. He knew Golding when he resided there in 1928 or 1929. Golding had a little cabin in which he slept, and boarded with a Mrs. Olds. Witness lived at the section house, which was between a quarter and a half a mile from Golding's place. He saw Golding frequently and exchanged visits with him. He generally was down in front of Golding's residence of an evening for probably an hour before going home to bed. He knew Mabel Wright but never saw her there. He had no knowledge of her residing there.

Irving Cowles, a witness on behalf of respondent, testified substantially as follows: He had known Warren Golding all his life. He knew Mabel Wright. He was well acquainted with the people of Nixon, Sutcliffe and on the Indian Reservation. He worked for Golding at Nixon from 1909 to 1922. Witness was living in Reno after 1927, but after that had occasion to take rides to the reservation on Sundays. Asked if he knew the relationship existing between Golding and Mabel Wright in

Nixon and Sutcliffe, he replied that he did, and that the reputation was that Mabel Wright was working for Golding as a servant in the house. He testified that when Golding died he was around eighty-one or eighty-two years old; and that Golding commenced to reside at 257 Mill Street in the latter part of May or the first of June 1936. Witness would call at the house every day and sometimes three or four times a day. When Golding got sick he told witness that he would "phone to the reservation and get Mabel Wright to come and take care of me * * * She is a good cook and a good housekeeper and she will give me first class care." It was in the latter part of July or the first of August that Mabel came there and remained there till Golding died, and attended his funeral in Wadsworth. She did the cooking and kept the house there very clean and took first class care of Golding. He and Mabel occupied separate rooms. Witness saw no change in relationship of master and servant, to that of husband and wife. If there had been such a change he believed he would have observed it. Mabel never told witness that she was the wife of Golding, nor indicated it in any way. She always showed the greatest concern for Golding, and immediately after his death she was beside his bed holding his hand and crying.

Robert Schultz, a witness on behalf of respondent, testified substantially as follows: He was in the employ of Golding at Nixon in the years 1927 and 1928. He went into that employment in the month of February or March of the former year, first as a clerk and later had complete charge of the store. He knew Mabel Wright. He first got acquainted with her as a customer of the store. While he was in the employ of Golding, Mabel also worked for him. She would come in and wash the dishes and clean house and make the beds, etc. She was a part time employee. She was not continually engaged in performing housework at the Golding home after Mrs. Golding left. There were other Indian girls doing the work the same as Mabel.

"If there were Indian girls down there he would get them in there, there was no distinction made in that respect." When Mabel was working there she resided at the home of her parents and at a cabin in back of the Golding home. Mabel never occupied any of the bedrooms in the Golding home. After the Goldings were divorced the witness lived there a little over a year. He was a confident and companion of Golding. He never saw Golding introduce Mabel Wright to any of the people who came to the reservation. He never heard Mabel make any statement that Mr. Golding was her husband. Golding occupied his room alone at nights. It was approximately a year and a half after the divorce when Golding sold the store. Mabel took no part in the transaction.

The letters, five in number, written by Golding in Los Angeles, California, to appellant, between 1933 and June 1936, were all addressed to Mabel Wright. The first of these, introduced in evidence, had the first page missing. It was signed, "Yours truly, W. T. Golding." The second letter commenced: "Dear Mabel" and was signed, "Yours truly, W. T. Golding." The third commenced, "Dear Mabel," and was signed, "Yours truly, W. T. Golding." The fourth, dated March 1, 1932, commenced, "Friend Mabel," and was signed, "Yours, Golding." The fifth, of date, May 17, 1931, commenced, "Mabel," and was signed, "Yours, W. T. Golding." A letter dated Reno, Nev., Sept. 13, 1936, after Golding's death, addressed to Mrs. E. Long, of Los Angeles, written by appellant, was signed, "Mabel Wright." A check dated in Los Angeles, California, Dec. 2, 1930, made by Golding payable to the order of Mabel Wright, was endorsed on the back, "Miss Mabel Wright," by appellant. Two letters from her to him introduced in evidence commenced: "My dear Mr. Golding," and were signed, "From Mabel Wright."

We are of the opinion that there is substantial evidence in the foregoing statement to support the decision of the court, and require an affirmance of the judgment.

Appellant contends that there is no evidence contradicting her testimony that on July 16, 1927, he asked her to marry him and she assented. True, there is no evidence directly contradicting it, but under the circumstances, Golding being dead and no other witness present at the time of the claimed agreement of marriage, such evidence could not have been obtained.

■■ But the trial court was not bound by her undisputed testimony on this point. That court was the exclusive judge of her credibility, and if persuaded from her demeanor on the stand or circumstances in evidence, or from the character of her testimony, that it was unreliable, had the power to disregard it. As stated in Catlett v. Chestnut, 107 Fla. 498, 146 So. 241, 246, 91 A. L. R. 212: "Testimony may be unimpeached by any direct evidence to the contrary, and yet be so contrary to natural laws, inherently improbable or unreasonable, opposed to common knowledge, inconsistent with other circumstances established in evidence, or so contradictory within itself, as to be subject to rejection by the court or jury as a trier of the facts."

■ Considerable latitude was allowed by counsel and the court in the admission of testimony, but being in the record, its weight was for the trial court. Some of the evidence introduced by respondent tended to prove that the only relation existed between Golding and appellant was that of master and servant. Familiars like Caughlin, Cowell, and Schultz, with ample opportunity for observation provided by daily contact over quite a period of time, saw nothing in the conduct of the two to indicate a nearer relation than master and servant.

Appellant's version of her cohabitation with him at Sutcliffe is contradicted by the two Coopers, who resided there. It is also somewhat inconsistent with the statement of her mother that Mabel "was visiting him in the day time." Other circumstances, which furnished the trial court with a basis for a legitimate inference unfavorable to the version of appellant and her witnesses, are the following: The character of the cohabitation

relied on by appellant as evidence of a common law marriage; the character of the letters that passed between them and from appellant to Mrs. Long; the lack of any evidence to corroborate appellant that she took the name of Golding after marriage, or ever used the name; her denial that after her marriage she ever wrote to any one using the name of Mabel Wright, and retraction of that statement after being confronted with her letters to the contrary.

As to the character of the cohabitation claimed by appellant, it was quite unlike the ordinary course of marriage. Appellant's evidence does not show a constant living together, but on the other hand, discloses a series of intervals of more or less time when they were not together, beginning immediately after July 16, 1927.

From 1933 to June 1936 they were not together at all but living in different states. This is not accounted for on the ground of strained relations, but as appellant states, because she had to return to Nixon to take care of some little children of a deceased sister. Whether this was a satisfactory explanation was, of course, for the trial court to say.

As to the character of the letters written by Golding to appellant, it is significant that in none was she referred to as wife, and that each letter to her was commenced in a most formal manner, as "Dear Mabel, Friend Mabel, Mabel" and concluded in an equally formal manner, as, "Yours truly, W. T. Golding, Yours, Golding, Yours, W. T. Golding"; the letters from her to him were equally formal, commencing, "My dear Mr. Golding:" and signed, "From Mabel Wright." They contain no allusion to him as husband. True, one of her letters contains expressions of affection, and there is other evidence revealing that she was fond of him, as that which disclosed her clinging to his hand and weeping by his deathbed. This, however, could have been reconciled by the trial court on the score of their long and intimate acquaintance and his many acts of friendship towards her. That this feeling was reciprocal is

derivable from his letters and acts, and could have been attributed by the court to the same cause.

A significant circumstance pointing towards the relation of master and servant is found in the testimony of Irving Cowles. When Golding got sick he told Cowles that he would "phone to the reservation and get Mabel Wright to come and take care of me. * * * She is a good cook and will give me first class care."

Our statement of what the trial court could have considered as indicating that there was no common law marriage is not exhaustive, but enough has been stated to show that its judgment rests on substantial evidence. That point being reached, it is unnecessary to comment on the evidence to the contrary.

■ It is contended by appellant that the action of the court, in overruling the objection to the probate of the will and admitting it to probate, was in the nature of granting a motion for a nonsuit and was error because there was evidence offered by her sufficient to submit the case to the court and jury. If there is any merit in this contention, the error claimed would have been available only as arising from the first trial. On the second trial respondent did not rely on the insufficiency of the evidence offered by appellant, but introduced, as we have pointed out, substantial evidence on the issue.

The judgment and order denying a new trial are affirmed.

COLEMAN, J., died before the opinion in this case was written.

ORR, J., did not participate in any of the proceedings relative thereto.